805 F.2d 907
 22 Fed. R. Evid. Serv. 86
 ROCKY MOUNTAIN HELICOPTERS, INC., Southeastern Aviation
(California), Inc., as agent for Underwriters at
Lloyds, London and Certain Insurance
Companies, Plaintiffs-Appellees,
v.
BELL HELICOPTERS TEXTRON, A DIVISION OF TEXTRON, INC.
Defendant-Appellant.
ROCKY MOUNTAIN HELICOPTERS, INC., and Southeastern Aviation
(California), Inc., Agent for Underwriters at
Lloyds, London, Plaintiffs-Appellants,
Certain Insurance Companies, Plaintiffs,
v.
BELL HELICOPTERS TEXTRON, A DIVISION OF TEXTRON, INC.,
Defendant-Appellee.
 Nos. 84-2442, 84-2623.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 19, 1986.
 
 Ralph S. LaMontagne, Jr. and Lawrence O. deCoster (Richard B. Johnson, Howard, Lewis & Peterson, Provo, Utah, with them on the brief), of Kern & Wooley, Los Angeles, Cal., for plaintiff-appellee-cross-appellants.
 H. Wayne Wadsworth (Steven C. Magleby, with him on the brief), of Watkiss & Campbell, Salt Lake City, Utah, for defendant-appellant-cross-appellee.
 Before BARRETT and TACHA, Circuit Judges, and BOHANON,* United States District Judge.
 BARRETT, Circuit Judge.
 
 
 1
 This appeal from an Order on Contract Issues and from a Judgment on a Special Verdict entered by the District Court is brought by Bell Helicopter Textron, Inc. (Bell), the defendant below. Rocky Mountain Helicopters, Inc. (Rocky Mountain) and Southeastern Aviation, Inc. (Southeastern), plaintiffs below, cross appeal. This is a diversity action and Texas law, where applicable, controls.
 
 
 2
 In 1977, Rocky Mountain purchased a helicopter from Bell for use in its logging operations. Rocky Mountain had initially leased the helicopter from Bell, then entered into a conditional sale contract. Provisions in both the sale contract and the lease agreement provided that, as purchaser, Rocky Mountain would obtain insurance for the helicopter. According to the sale contract, the insurance would be "for the benefit of the Purchaser and Seller as their interests may appear...." In accordance with this requirement, Rocky Mountain added the helicopter to an existing blanket policy that provided hull loss insurance for Rocky Mountain's fleet of nearly fifty helicopters. Southeastern, agent for Lloyd's of London, and certain other insurance companies were the carriers for this insurance policy.
 
 
 3
 On April 19, 1979, Rocky Mountain was using the subject helicopter in a logging operation near Darby, Montana, when it crashed killing both the pilot and copilot. At the time of the accident, the helicopter was being used to transport logs felled by sawers on the ground. The logs were attached by a choker to a long, retractable cable that hung from the belly of the helicopter, then lifted and carried to a landing area. It was at the landing area that the accident occurred.
 
 
 4
 Rocky Mountain and Southeastern brought suit against Bell, the manufacturer, for damages. They alleged that the accident was caused by fatigue failure of the "trunnion," a part of the helicopter that connected the mast with the rotor blades. In response, Bell argued that the accident occurred because a reckless and inexperienced pilot, employed by Rocky Mountain, picked up a log that exceeded the external load weight limitation of the helicopter by 1660 pounds and then overreacted and lost control of the helicopter when he was forced to make an emergency release of the log near the landing site. The jury returned a special verdict finding that Rocky Mountain was forty-five percent negligent and Bell was fifty-five percent negligent.
 
 
 5
 The numerous issues Bell raises in this appeal fall into three general areas of dispute. First, and foremost, Bell argues that the district court erred in finding that Bell was not immune from suit. Bell maintains that it was an insured party under the policy and hence was immune from suit by its insurer, Southeastern, and by its coinsured, Rocky Mountain. Second, Bell appeals several evidentiary rulings made by the district court. In particular, Bell objects to the exclusion of evidence that Rocky Mountain allowed an untrained and reckless pilot to command the helicopter after it had received notice of such facts. Finally, both Bell and Rocky Mountain dispute the district court's award of prejudgment interest.
 
 I.
 
 6
 Before addressing the insurance issues raised by Bell, it is necessary to examine the background and nature of the insurance policy in question. As noted above, Rocky Mountain acted in accordance with the conditional sale contract and the lease agreement by arranging to have the helicopter insured under a hull loss policy written by Southeastern. The policy named Rocky Mountain as the insured and contained over one hundred endorsements, two of which are important in this case. Endorsement 13 extended breach of warranty coverage to Bell by providing that "[t]he insurance afforded by the Policy shall not be invalidated as regards the interest of the Lienholder by any act or neglect of the Insured...." To receive this protection, the endorsement required that the lienholders pay premiums and tender proof of any loss if the insured failed to do so.
 
 
 7
 Another endorsement, Endorsement 30, was added to the policy in October, 1976. Endorsement 30 reserved for Southeastern a right of subrogation against the lienholder-manufacturer, Bell, for such action for recovery as the mortgagor, Rocky Mountain, might be able to maintain. A certificate of insurance confirming that coverage for the helicopter was in effect was sent to Bell in December, 1977.
 
 
 8
 In August, 1977, Rocky Mountain executed a promissory note in the amount of $1,752,490 to Bell for the purchase of the helicopter. Bell assigned its rights under this promissory note to Textron Financial Corporation, Inc. (Textron), a related corporation and apparently the financing arm of Bell. Following this assignment, Bell's name was dropped from the breach of warranty endorsement and Textron's name was substituted. Though the issue was disputed at trial, Bell maintained and the district court found that Textron was an agent of Bell's and that Bell was the lienholder covered by Endorsement 13, the breach of warranty endorsement.
 
 
 9
 On the basis of these facts, Bell argued that under Endorsement 13 it was an "insured party" and thus, by operation of the time honored rule that an insurance company cannot sue its own insured, was immune from suit. 16 Rhodes, Couch On Insurance 2d, Sec. 61:136-137 (rev. ed. 1983).
 
 
 10
 The district court agreed that Bell was an insured party but ruled that Bell's immunity was waived by Endorsement 30 which reserved for Southeastern the right of subrogation. Bell appeals this finding. Rocky Mountain and Southeastern cross appeal the trial court's ruling that Bell was an "insured party" arguing, first, that Textron rather than Bell was named in Endorsement 13 and, second, that even if Bell were covered by Endorsement 13, it would not be immune from suit under Texas law. We need not reach Bell's argument that it did not waive its immunity because, while we agree with the trial court that Bell was covered by Endorsement 13, we agree with Rocky Mountain and Southeastern that Bell was not an immune insured party under Texas law.
 
 
 11
 The insurance policy in effect at the time of the accident was issued to Rocky Mountain and names Rocky Mountain, not Bell, as the insured party. The only references to Bell (or its associated corporation, Textron) in the entire policy occur in Endorsements 13 and 30 which describe Textron as a "lienholder" or "loss payee" and refer to Rocky Mountain as the "insured." Thus, the question arises whether a lienholder-payee under a breach of warranty clause in an insurance contract is an insured party for the purpose of immunity from subrogation.
 
 
 12
 In support of its position that a lienholder is immune from subrogation, Bell refers to 10A Rhodes, supra, Sec. 42:728 at 761-63 (footnotes omitted) for the proposition that the standard or union mortgage clause in an insurance contract, such as Endorsement 13, creates an "independent or separate contract" between the mortgagee and the insurer:
 
 
 13
 There are accordingly in substance two contracts of insurance, one with the mortgagee and the other with the mortgagor. The mortgagee does not have the status of a beneficiary, and the effect is the same as though the mortgagee had procured a separate policy naming himself as the insured.
 
 
 14
 Accord 5A J. Appleman and J. Appleman, Insurance Law and Practice Sec. 3401 at 286-292 (rev. ed. 1970). By this analysis, Bell argues, a contract for insurance existed between Southeastern and Bell and hence Bell is immune from suit.
 
 
 15
 Yet there are limits to this fiction that a mortgage clause operates as an independent contract. According to Couch on Insurance, it exists "only for the limited purpose of preventing the defeating of the insurance by the act of the insured [i.e., Rocky Mountain] alone...." 10A Rhodes, supra Sec. 42:731 at 766. It is nowhere clearly established and we find no examples in the cases cited by Bell that this fiction of an independent contract has been applied to facilitate or frustrate a right of subrogation. At least one court has found that this fiction does not make the loss payee "an insured for all purposes" and has specifically declined to apply it to immunize the mortgagee from a subrogation action. Dalrymple v. Royal-Globe Ins. Co., 280 Ark. 514, 659 S.W.2d 938, 940 (1983). For the reasons noted below involving Texas law, we are reluctant to rely on this fiction in the present context.
 
 
 16
 Bell also cites several cases in which the basic rule immunizing the insured from suit by its insurance company has been extended to protect a co-insured party in various situations. See, e.g., Royal Exchange Assur. of America, Inc. v. S.S. President Adams, 510 F.Supp. 581 (W.D.Wash.1981) (insurer that paid an insured shipper for cargo damage may not subrogate against carrier, whose stevedoring operations insurer covers under unrelated liability policy, for damage carrier caused to shipper's cargo); Truck Ins. Exchange v. Transport Indem. Co., 591 P.2d 188 (Mont.1979) (truck driver was covered by "additional insured" language in endorsement to truck insurance policy and immune from subrogation suit for negligence by insurer); Home Ins. Co. v. Pinski Brothers, Inc., 500 P.2d 945 (Mont.1972) (boiler insurer precluded from subrogating against architect covered under separate liability policy issued by same insurer). These cases are of limited value, however, since in each of them the status of the party as a co-insured is clearly established or unquestioned. They do not help us over the initial hurdle of determining whether Bell is in fact a co-insured party.
 
 
 17
 Finally, Bell invites the court to analogize the facts in this case with those in numerous "builder's risk" cases. In those cases, typically, a policy issued to the owner or general contractor of a building under construction to insure the premises also contains a provision covering the property of construction contractors who are working on the building. In Transamerica Ins. Co. v. Gage Plumbing and Heating Co. Inc., 433 F.2d 1051 (10th Cir.1970), for example, Transamerica issued an insurance policy naming the owner of a building under construction and the general contractor as the insured parties. A clause in the policy also extended coverage to "temporary structures, materials, equipment and supplies of all kinds incident to the construction of said building ... for which the insured is legally liable...." Id. at 1053.
 
 
 18
 In Transamerica, this court held that Gage Plumbing & Heating, the subcontractor doing work on the building, was a co-insured entitled to reimbursement for tools and equipment it lost when the building was destroyed by fire. We further held that Gage was immune from a subrogation action brought by Transamerica claiming that the fire was negligently caused by one of Gage's employees. Though Gage was not a named insured, this court followed Louisiana and Kansas law and held that since the policy was intended to cover the subcontractor, Gage was a co-insured and immune from suit. Other cases cited by Bell have produced similar results. See Baugh-Belarde Const. Co. v. College Utilities Corp., 561 P.2d 1211 (Alaska 1977); Board of Ed. of Jordan School Dist. v. Hales, 566 P.2d 1246 (Utah 1977); General Ins. Co. of America v. Stoddard Wendle Ford Motors, 67 Wash.2d 973, 410 P.2d 904 (1966). The district court was understandably influenced by these decisions and by the "separate contract" fiction in finding that Bell was an insured party under the policy and thus immune from a subrogation action by Southeastern.
 
 
 19
 While we view Bell's authorities as instructive, we must recognize that there is a difference of opinion on this issue. For example, Rocky Mountain cites Dalrymple, 659 S.W.2d at 940, in which the Supreme Court of Arkansas considered a builder's risk case and found that "[a] loss payee is not an insured in the usual sense of the word but simply a loss payee who is entitled to payment for loss of his property interest; there is no immunity from liability for negligence. A loss payee seeking benefit of liability protection should pay for it."
 
 
 20
 As this language reflects, the court in Dalrymple recognized a distinction between property coverage and liability insurance. It found that while the builder's risk policy insured the contractor's property on the premises, it did not insure the contractor against all damages to the building that might result from his negligence. Thus, the insurance company was allowed to bring a subrogation action against the contractor for negligence. Other cases are in accord. See, Paul Tishman Co. v. Carney & Del Guidice, Inc., 36 A.D.2d 273, 320 N.Y.S.2d 396 (N.Y.1971), aff'd 34 N.Y.2d 941, 359 N.Y.S.2d 561, 316 N.E.2d 875 (N.Y.1974); Public Service Co. of Okl. v. Black & Veatch, Consulting Engineers, 328 F.Supp. 14 (N.D.Okla.1971), and Employers' Fire Ins. Co. v. Behunin, 275 F.Supp. 399 (U.S.D.C.Colo.1967); Turner Const. Co. v. John B. Kelly Co., 442 F.Supp. 551 (E.D.Penn.1976).
 
 
 21
 Texas law controls in this case and we observe at the outset that the principle of subrogation is particularly strong in Texas, Texas Real Estate Commission v. Century 21 Sec. Realty, Inc., 598 S.W.2d 920, 922 (Tex.Civ.App.1980), perhaps stronger than in any other state. McBroome-Bennett Plumbing, Inc. v. Villa France, Inc., 515 S.W.2d 32, 36 (Tex.Civ.App.1974). Not surprisingly, Texas is among those jurisdictions that reject the notion that a loss payee is necessarily immune from subrogation.
 
 
 22
 In McBroome, the Texas Court of Appeals considered a case similar to Transamerica involving a builder's risk insurance policy taken out by Villa France, Inc., the owner and general contractor of an apartment house construction project. As in Transamerica, the policy covered, in addition to the apartment complex, "builder's machinery, tools and equipment" on the premises for which the insured was liable. Id. at 35. And, as in Transamerica, the negligence of an employee of subcontractor McBroome-Bennett allegedly caused a fire that damaged the building and some tools belonging to McBroome-Bennett. Contrary to the result in Transamerica, however, the Texas Court of Appeals ruled that while the subcontractor may have had an interest under the policy, it was not immune from a subrogation action brought by the insurance company because the subcontractor was not an insured under the policy issued to Villa France.
 
 
 23
 In McBroome, the court reasoned that it must look to the "true relationship" of the parties and carefully examine the "realities" to determine whether or not a party was an insured. Id. at 37. In finding that subcontractor McBroome-Bennett was not an insured party, the court noted that only Villa France was named as an insured, that only Villa France paid a premium for the protection of the policy, that subcontractor McBroome-Bennett had not entered the picture when the policy was drafted, and that McBroome-Bennett was in no way obligated to the insurance company. The court noted there was no evidence that the insurance company and Villa France ever intended that a subcontractor would automatically become "clothed with the status of coinsured and thereby become protected by the entire agreement." Id. at 39.
 
 
 24
 The court went on to explain, in what Bell refers to as McBroome's "alternate holding," that even if the subcontractor were considered an insured under the policy, the realities would demand that the subcontractor be denominated "a limited insured or a special insured" who was covered only "to the extent of his interest in the tools and property...." Id. at 39 (italics omitted). Thus in McBroome, as in Dalrymple and other cases noted above, the court distinguished between the operation of property coverage and liability insurance. Even if the subcontractor was insured under the policy for damage to its tools on the premises, it was not insured for the damage it negligently caused to the property of the owner and general contractor. Had there been no insurance, the court found, Villa France would surely have had a cause of action to which the insurer would be subrogated and this right of subrogation should not be destroyed on the "tenuous grounds" that McBroome-Bennett might have been entitled to recover for fire damage to its tools. Id. at 37. In reaching these conclusions, the Texas court considered the Transamerica case but specifically declined to follow it, noting that it was based on Kansas and Louisiana precedent not controlling in Texas. Id. at 40.
 
 
 25
 Applying the McBroome approach to our facts to determine if Bell is an insured party, we believe that the "realities" present something of a double image lending support to both sides. Arguing that it is an insured party under the policy, Bell points out that Endorsement 13 provides breach of warranty coverage for the benefit of Bell and that Southeastern sent certificates of insurance to Bell giving notice that a policy was in effect on the helicopter. Additionally, Bell argues that Endorsement 30, reserving for Southeastern a right of subrogation against Bell, demonstrates that Southeastern recognized Bell's interests under the policy. Citing the language in McBroome in which the court stated that if McBroome-Bennett "had been named as an insured," no right of subrogation would exist, Bell argues that Endorsement 13 in fact names Textron (hence Bell), thus making it an insured party. Id. at 38.
 
 
 26
 For its part, however, Rocky Mountain notes that the protection provided under the policy was "very limited" covering only the balance on the note, that the protection provided under Endorsement 13 was likewise very limited, that neither Bell nor Textron were listed as insured parties under the policy, that neither Bell nor Textron paid any premiums, and that the policy was not intended to afford liability coverage for Bell's negligence. We note that it was Rocky Mountain, not Bell, that negotiated and contracted with Southeastern, that the policy was issued to Rocky Mountain, not Bell, and that Southeastern made payment for the lost helicopter to Rocky Mountain, not Bell. We note further that if Bell and Rocky Mountain had intended that both parties have the status of "insured" under the policy, their sale agreement would have reflected this intent. The earlier lease agreement, for example, required that insurance coverage be obtained "naming both LESSEE (Rocky Mountain) and BELL as full insureds ..." (emphasis added) and the earlier version of the policy in fact named both as insured parties. As noted above, however, the subsequent sale contract required only that insurance be obtained "for the benefit of the Purchaser and Seller as their interests may appear...." In the subsequent policy, the one in effect at the time of the accident, only Rocky Mountain was listed as the insured party.
 
 
 27
 While it is a close call, the picture that emerges is the one urged by Rocky Mountain. We hold that Bell was not an insured party under the policy in effect at the time of the accident. The fiction that the breach of warranty provision in Endorsement 13 constitutes a "separate contract," standing alone in the face of other realities, is too tenuous to bestow upon Bell the status of an insured and make it completely immune from subrogation. The evidence, as revealed in the language of the sale contract and the cautionary reservation of the subrogation right by Southeastern in Endorsement 30, indicates no intent to create such status and immunity. Endorsement 13 served only the limited purpose of providing that the potential interests of the beneficiary, Bell, would not be lost if, for example, Rocky Mountain failed to pay a premium, provided that Bell stepped in and paid said premium.
 
 
 28
 To recognize Bell as an insured party under a policy in which it is not listed as an insured, when it neither negotiated the terms of the policy nor made payments to the insurer, on the strength of the breach of warranty endorsement, would strain reality. As to Bell's interest in the helicopter, such interest is analogous to the contractor's interest in its lost tools in McBroome. This interest does not make it an insured party under Texas law.
 
 
 29
 Bell urges us to recognize a distinction between McBroome and our case. It points out that in McBroome the subcontractor's property was not covered by the builder's risk policy, but rather only the liability of the general contractor to the subcontractor was covered. See, Stafford Metal Works, Inc. v. Cook Paint & Varnish Co., 418 F.Supp. 56 (N.D.Texas 1976) (analysis of McBroome ). We do not view this distinction as fatal. In any case we fail to see that this necessarily sets McBroome apart from the present situation. Under our facts, Bell held a mortgage on the helicopter and Rocky Mountain, the mortgagor, owed Bell $1,063,227. Rocky Mountain's debt to Bell was Bell's only "interest" in the helicopter. If Rocky Mountain had paid the entire balance to Bell and hence was no longer liable, Bell would have no interest under the policy. Thus, as in McBroome, it may be said that for all practical purposes Bell's property is not insured. Rather, Rocky Mountain's liability to Bell is the only insured interest.
 
 
 30
 We would reach the same result under McBroome's "alternate" holding. Even if we were to hold that Bell was an insured party under the policy, McBroome instructs that its status would be limited to its property or breach of warranty interest. Bell would not, under McBroome, be immune from suit for its liability in negligence. While Bell argues that this holding is dictum, we nonetheless hold it indicative of the Texas court's disposition of this issue and not in conflict with other Texas court decisions.
 
 
 31
 As noted, the district court found that Bell was an insured party under the policy but found that Endorsement 30 operated as a waiver of Bell's immunity from subrogation. Although we disagree with the finding that Bell was an insured party, we arrive at the same result, by a different process, as that reached by the trial court.
 
 
 32
 In regard to the insurance issue, Bell also argues that if it is liable to Southeastern, then Rocky Mountain is obliged to indemnify Bell for the amount of Southeastern's recovery. This is so, Bell explains, because Rocky Mountain was contractually obligated to provide Bell with hull insurance as its "interest may appear." If Bell must pay Southeastern, it argues, then its interests were not insured and Rocky Mountain is liable to Bell.
 
 
 33
 The district court rejected this argument noting that, pursuant to the agreement, Rocky Mountain did obtain insurance. Certificates indicating that the insurance was in effect were sent from Southeastern to Bell. These certificates, the court found, referred Bell to the actual policy that was in Rocky Mountain's possession. Because Bell never indicated that this coverage, of which it had constructive notice, was insufficient, the court found that the policy satisfied Bell's request for coverage. We agree.
 
 
 34
 Finally, Bell argues that as co-insured, Rocky Mountain cannot bring suit against Bell. Bell reasons that the conditional sale contract required Rocky Mountain to obtain insurance for the helicopter, and this provision amounted to a tacit agreement that, in the event of loss, Rocky Mountain would look solely to the insurance proceeds to cover any losses. We look for guidance to the case of Wichita City Lines v. Puckett, 156 Tex. 456, 295 S.W.2d 894 (Tex.1956). In that case, the Texas Supreme Court declared it would recognize an agreement to exonerate a party from its own liability for damages only if the agreement contained a provision to that effect and such provision, after strict construction against such intendment, was "clear and unambiguous." Id. at 899. There is no such provision in the conditional sale contract. Thus, we reject Bell's argument.
 
 II.
 
 35
 Bell's second area of appeal concerns several evidentiary rulings made by the district court excluding evidence offered by Bell and, in one instance, admitting evidence offered by Rocky Mountain. The most compelling issue raised by Bell is its objection to the exclusion of evidence offered to show that Rocky Mountain was negligent in failing to exercise reasonable care for its own property by allowing an untrained and reckless pilot to command the helicopter after receiving notice of such facts.
 
 
 36
 As noted above, Rocky Mountain and Southeastern argue that the helicopter crash was caused by fatigue failure of the trunnion. Bell, on the other hand, insists that the crash was caused by the actions of the pilot, John Ball, whom they describe as inexperienced and reckless. At trial, Bell offered the deposition of John Leitz, a supervisory pilot with Rocky Mountain who had worked with Ball and given him flight instruction. Leitz testified that he knew of four occasions in the year prior to the accident that Ball had "over grossed," or picked up a load of logs too heavy for the helicopter. Leitz also testified that he had heard rumors one week before the accident that Ball was hauling some extremely heavy loads and that mechanics, co-pilots and ground crews were unhappy about him. Leitz said he told his supervisors at Rocky Mountain about these rumors and urged that they investigate immediately.
 
 
 37
 Bell also offered to call Phil Massicotte, a chief pilot, to testify about Ball's flying competence as it existed some period of months before the accident and to testify that he told supervisors at the time that Ball was not ready to fly as "left seat" or command pilot, the position Ball was flying at the time of the accident. Finally, Bell offered the deposition of a chocker setter, Mark Bartley. Bartley testified that from a chocker setter's point of view, Ball was "a little bit dangerous" and that he had complained about Ball to his superiors. After objections by Rocky Mountain, the trial judge excluded all of this evidence, exclusions which Bell claims were prejudicial error.
 
 
 38
 The district court apparently excluded this evidence because there is Texas case law to the effect that a plaintiff seeking recovery from a defendant-employer for the actions of an employee cannot submit evidence of the employer's negligent entrustment when the employer admits respondeat superior liability. Estate of Arrington v. Fields, 578 S.W.2d 173 (Tex.Civ.App.1979). The district court was also concerned that such evidence was irrelevant, prejudicial or improper character evidence.
 
 
 39
 In Arrington, the Texas Court of Appeals cited several Texas cases involving negligent entrustment and negligent hiring, some of which indicate that where "ordinary negligence is alleged ... negligent hiring and respondeat superior are mutually exclusive modes of recovery." Id. at 178. The Texas Court of Appeals noted other cases, however, holding that where a plaintiff has alleged ordinary negligence against the employee and gross negligence against the employer for hiring or entrusting the employee to carry out hazardous duties, the negligent hiring or entrusting cause of action would be an independent and separate ground for recovery. To distinguish between the two situations, the Texas Court of Appeals in Arrington pointed to a "discernable pattern" wherein the primary factor "is whether or not punitive damages are sought by the plaintiff." Id. at 178. Where punitive or exemplary damages are sought for gross negligence against an employer for hiring or entrusting an incompetent employee, the court stated, the employer may not preclude proof thereof by admitting or stipulating agency on the part of the driver or acknowledging that the driver was within the scope and course of his employment.
 
 
 40
 On the basis of Arrington, the district court concluded that Bell should not be permitted to offer evidence, by way of a defense, that Rocky Mountain was negligent in hiring, failing to train or failing to discipline John Ball. Rocky Mountain, the court noted, had stipulated that Ball was carrying a load that exceeded the recommended limit for the helicopter by 1660 pounds and that Ball was employed by Rocky Mountain and acting within the scope and course of his employment at the time of the crash. The district court apparently concluded that this was a case of simple negligence in which respondeat superior was admitted and, on the basis of Arrington, Bell's defense was inadmissible.
 
 
 41
 Bell argues on appeal that the rule relied upon by the district court is designed to prevent the waste of judicial resources and time when the "liability link" between the employer and employee has already been admitted or established. Bell points out that in this case it is not trying to prove the connection of Ball with Rocky Mountain. Rather, the evidence was offered to demonstrate the amount of negligence for which Rocky Mountain may be responsible once liability is established.
 
 
 42
 We hold that the trial judge committed no prejudicial error in excluding testimony to the effect that pilot John Ball had a propensity for carrying heavy loads. Since the parties agreed that Ball was carrying a heavy load at the time of the accident, further testimony on the matter would be irrelevant and possibly prejudicial under Fed.R.Evid. 403. Likewise, Massicotte's evaluation of Ball's skills some five months before the accident was remote enough in time to lack relevance and raise concerns about the potential prejudicial effect such evidence might have.
 
 
 43
 However, the exclusion of the reports Rocky Mountain received from Bartley and the rumors it heard from Leitz a week prior to the accident is a more complicated matter. Rocky Mountain urges, without explanation or support, that such rumors are hearsay and clearly inadmissible. Yet, because the evidence was offered not to prove the truth of the matter asserted but rather to show that Rocky Mountain may have had notice that it had in its employ an untrained and potentially unsafe pilot, the evidence seems to be arguably admissible.
 
 
 44
 We believe the district court erred in relying on Arrington to exclude evidence that Rocky Mountain may have known that Ball was an unsafe pilot. It may be the rule in Texas that a plaintiff may only offer evidence of unsafe hiring or entrusting on the part of an employer when it seeks punitive or exemplary damages. We can discover no Texas case, however, that addresses the issue of whether or when such evidence may be offered as an affirmative defense by a defendant. There are several cases in other jurisdictions in which such a defense has been raised. Moe v. Avions Marcel Dassault-Breguet Aviation, 727 F.2d 917 (10th Cir.), cert. denied, 469 U.S. 853, 105 S.Ct. 176, 83 L.Ed.2d 110 (1984); Grand Trunk Western Railroad Co. v. Pre-Fab Transit Company, Inc., 165 N.W.2d 281 (Mich.App.1968).
 
 
 45
 It might be possible to analogize the affirmative defense of negligent hiring or entrusting with the cause of action for the same and argue that only where gross or wanton negligence can be shown should such a defense be allowed. With no Texas law on point, however, we are reluctant to so venture. According to V.T.C.A., Civil Practice & Remedies Code Sec. 33.001(b) (Vernon 1986), any damages allowed a plaintiff shall be "diminished in proportion to the amount of negligence attributed to the person recovering." At least one commentator has pointed out that the various labels of aggravated negligence, such as would justify punitive or exemplary damages, have no practical value where the plaintiff's comparative negligence is concerned. V. Schwartz, Comparative Negligence Sec. 5.5 at 109 (2nd ed. 1986). We are inclined to agree with Bell that this case is not necessarily concerned simply with what happened at the moment of the accident. Rather, it potentially involves, on the one hand, the conduct of Bell's engineers in analyzing and testing the fatigue characteristics of various trunnions over a period of years and, on the other, the conduct of Rocky Mountain in managing its personnel and operating its helicopters in connection with its logging operations.
 
 
 46
 As noted above, however, the trial court had other reasons for excluding the proffered evidence. Much of it is in the nature of character evidence which, in civil cases, is not admissible for the purpose of proving that a person acted in conformity therewith on a particular occasion. Fed.R.Evid. 404. This limitation exists because character evidence is generally regarded as being of slight probative value and potentially very prejudicial. While Bell insisted that it was not offering the evidence of Ball's prior flying performance for the purpose of showing that he acted in conformity therewith, it is clear from the record that the trial court was concerned it would have that effect on the jury. The court was concerned that if the jurors heard testimony regarding John Ball's past flying conduct, they would be tempted to attribute such conduct to Ball, and hence to his employer Bell, at the time of the accident. Several commentators suggest that the danger of jury misuse of the evidence and the prejudicial impressions left in the minds of jurors, even after a proper limiting instruction, usually outweigh any detriment to a party's case caused by exclusion of the negligent entrustment evidence. See, 2 D. Louisell and C. Mueller, Federal Evidence, Sec. 143 at 164 (rev. ed. 1978); Note, "Agency: Negligent Entrustment--May the Defendant Choose the Plaintiff's Theory?" 30 Okla.L.Rev. 181 (1977).
 
 
 47
 The Notes of the Advisory Committee on Federal Rules of Evidence for Rule 404 indicate that where character evidence is offered for a purpose other than showing actions consistent therewith, there is no "mechanical solution" for admitting or excluding the evidence. According to the Committee, the determination must be made "whether the danger of undue prejudice outweighs the probative value of the evidence," a determination which lies squarely with the discretion of the trial court. United States v. Lowe, 569 F.2d 1113 (10th Cir.), cert. denied, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978). Under the circumstances in this case, we hold that the trial court did not abuse its discretion in excluding evidence regarding John Ball's prior flying record.
 
 
 48
 Bell also appeals the district court's decision to admit evidence from a "Photoelastic Study of Stress in 214 Trunnions" (Photoelastic Study) that was conducted by Bell after the accident. Bell argues that admission of this report communicated to the jury the fact that the trunnion had been redesigned and this constituted evidence of a subsequent remedial measure that should have been excluded under Fed.R.Evid., Rule 407. Rule 407 excludes evidence of measures taken after an event when such measures, "if taken previously, would have made the event less likely to occur...." We note, however, that the district court excluded any reference to trunnion redesign and Bell points to no such reference by any attorney or witness. Some of the exhibits in fact have pages omitted or blacked out where reference to the redesign was made. There is no showing of error.
 
 
 49
 Bell also argues, however, that evidence from the Photoelastic Study was itself inadmissible under Rule 407. Bell reasons that the Photoelastic Study, if conducted before the accident, would have made the accident less likely to occur and hence the test itself was a remedial measure. Specifically, Bell objects to the following remarks made by counsel for Rocky Mountain in his closing statement:
 
 
 50
 Now, why did Bell run these tests, just for the heck of it? There was a reason. They wanted to find out what would happen to this trunnion when it is subjected to these loads, because they didn't know because they didn't run these tests prior to the accident.
 
 
 51
 Bell raised its objection to admission of the Photoelastic Study at trial, but the district court found that Rule 407 does not read so broadly as to exclude post-accident tests or reports.
 
 
 52
 Bell cites no cases directly in support of its position. For its part, Rocky Mountain refers us to Rozier v. Ford Motor Co., 573 F.2d 1332, 1343 (5th Cir.1978). In that case the court held that a document prepared by Ford was admissible because it was written before the event in question "and was not, in itself, a remedial measure taken." More on point, we note the decision of the United States District Court in Westmoreland v. CBS, Inc., 601 F.Supp. 66 (S.D.N.Y.1984), to admit a post-event report prepared by defendant CBS. The court cited several appellate court decisions as examples of cases in which post-event reports were admitted in industrial and railroad accident litigation. See, Wright v. Farmer's Co-op of Arkansas and Oklahoma, 681 F.2d 549 (8th Cir.1982); United States v. Lykes Bros. S.S. Co., 432 F.2d 1076 (5th Cir.1970). None of these cases, however, specifically address the admissibility of post-event tests or reports under Rule 407. This issue was presented in James v. Bell Helicopter Co., 715 F.2d 166 (5th Cir.1983), but the facts of that case made it unnecessary for the court to resolve it.
 
 
 53
 We hold that the district court did not err in admitting evidence from the Photoelastic Study. It would strain the spirit of the remedial measure prohibition in Rule 407 to extend its shield to evidence contained in post-event tests or reports. It might be possible in rare situations to characterize such reports as "measures" which, if conducted previously, would reduce the likelihood of the occurrence. Yet it is usually sounder to recognize that such tests are conducted for the purpose of investigating the occurrence to discover what might have gone wrong or right. Remedial measures are those actions taken to remedy any flaws or failures indicated by the test. In this case, the remedial measure was not the Photoelastic Study of the trunnion but rather the subsequent redesign of the trunnion. As noted above, references to redesign were excluded at trial.
 
 
 54
 We believe that the policy considerations that underlie Rule 407, such as encouraging remedial measures, are not as vigorously implicated where investigative tests and reports are concerned. To the extent that such policy concerns are implicated, they are outweighed by what the Westmoreland court referred to as the danger of depriving "injured claimants of one of the best and most accurate sources of evidence and information." 601 F.Supp. at 68.
 
 
 55
 While we hold that post-event investigative tests and reports are not excluded by Rule 407, we nonetheless believe that harmless error occurred when the attorney for Rocky Mountain made the above quoted reference to the Photoelastic Study. Though the test was not itself a remedial measure under Rule 407, the attorney's remarks had the effect of characterizing it as such. Rocky Mountain argued to the jury, in effect, that by conducting the test after the accident, Bell admitted it had been negligent in failing to conduct the test sooner. It was inconsistent and improper for Rocky Mountain to argue to the court that the test should be admitted because it was not a remedial measure only to turn around and suggest to the jury that it was a remedial measure. The correct procedure is to refer to the results of such tests or reports without referring to their post-event time frame, unless one of the exceptions to Rule 407 applies. After consideration of the totality of the evidence in the record, however, we hold that the remarks by Rocky Mountain's counsel, though improper, were not prejudicial.
 
 
 56
 Bell also appeals rulings by the district court excluding deposition testimony to the effect that Bell had never experienced prior trunnion failure. This evidence was tendered, Bell explains, to demonstrate a lack of foreseeability that trunnions required fatigue testing rather than fatigue analysis. The trunnion in question, however, had been in use for less than a year prior to the accident. The evidence offered does not seem to be specifically concerned with the particular model of trunnion that was in use at the time of the accident, nor does the deposition contain any evidence regarding Bell's experience with that model of trunnion on aircraft used in logging operations. The concern about such evidence is that it may serve to confuse the issues and lack relevance. The trial court did not abuse its discretion in ruling to exclude it.
 
 
 57
 Nor do we agree with Bell that the district court abused its discretion or committed prejudicial error in admitting the testimony of Dr. Robert Waldron, who has a doctorate degree in metallurgical engineering and experience investigating some four or five hundred aviation accidents, three-quarters of them helicopter accidents, when he stated that only faulty design would allow a rotor to strike the tail of a helicopter as a result of pilot operation, or that the service life of a component part of a helicopter should be determined. We believe Dr. Waldron was sufficiently qualified under Fed.R.Evid., Rule 702 to offer this opinion.
 
 
 58
 Finally, we are inclined to agree with Bell that pilot Phil Massicotte was not qualified to volunteer, in the course of one of his answers on direct examination, that in his opinion "an educated engineer" would not design a helicopter in such a way that the rotor would strike the tail. Yet, Massicotte's testimony took up nearly sixty pages of transcript and the above response appears to have been the only time he offered his opinion as to what an engineer should do. The question Rocky Mountain's counsel asked of Massicotte did not call for such a response and, though Bell objected to the question itself before Massicotte answered it, Bell did not move to strike the unanticipated remark or request a limiting instruction after the fact. Under the circumstances, we find no prejudicial error.
 
 III.
 
 59
 The last general area of appeal, in which both sides raise objections, concerns the district court's award of prejudgment interest to Rocky Mountain. Bell argues that the award of any prejudgment interest was inappropriate because it is not provided for in Endorsement 30. As noted above, Endorsement 30 reserves for Southeastern the right of subrogation against Bell. It is Bell's position that this reservation amounts to a contract between Bell and Southeastern whereby Bell was entitled to the unrestricted possession and use of any insurance payments made to Bell by Southeastern until and unless Southeastern recovered these "sums paid" in a "separate proceeding."
 
 
 60
 The district court correctly observed that the language in Endorsement 30 reserved for Southeastern the right of subrogation "without prejudice" to recover not simply "sums paid" but also any sums for which Bell "would have been liable as manufacturer ... had the aircraft ... been sold by [Bell] free of any security interest prior to loss." The district court concluded that because any manufacturer would be liable for prejudgment interest in this case, Bell was likewise liable. We agree with the district court's reading of Endorsement 30 and affirm its award of prejudgment interest.
 
 
 61
 Rocky Mountain raises an objection to the amount of the district court's prejudgment interest award. Following a hearing on the matter, the district court awarded an interest rate of 9% per annum, not compounded, for the period from June 5, 1979 (the date upon which a check from Southeastern was sent by Rocky Mountain through Textron) through the date of the judgment. Rocky Mountain does not allege that this formulation of prejudgment interest is in any way contrary to the law in effect at the time the judgment was entered. It calls our attention, however, to a case subsequently decided by the Supreme Court of Texas, Linda Cavnar, et al. v. Quality Control Parking, Inc., 696 S.W.2d 549 (Tex.1985). In that case, the Texas Supreme Court declared that a prevailing plaintiff is entitled to interest compounded daily. The interest rate is the rate in effect on the date judgment is entered. Rocky Mountain argues that under the Cavnar formula, it was entitled to an interest rate of 10% per annum compounded daily. The actual interest judgment entered by the district court was $332,024. Rocky Mountain maintains that it was entitled to $496,542.
 
 
 62
 The Cavnar decision apparently changed the method by which prejudgment interest is calculated in Texas and clearly states that "[t]o the extent that other cases conflict with this holding, they are overruled." Id. at 554. Its impact on our case is unclear, however, since it was handed down after the district court entered the award of prejudgment interest to Rocky Mountain. The last sentence of the Cavnar decision declares "our holding ... applies to all future cases as well as those still in the judicial process involving wrongful death, survival and personal injury actions." Id. at 556. The instant case does not involve wrongful death, survival or personal injury actions. The district court appears to have acted in accord with Texas law in calculating prejudgment interest as that law existed at the time. We affirm the award.
 
 
 63
 WE AFFIRM.
 
 
 
 *
 The Honorable Luther L. Bohanon, Senior United States District Judge for the Northern, Eastern and Western Districts of Oklahoma