TARANTO, Circuit Judge,
with whom LOURIE and REYNA, Circuit Judges, join, dissenting from the denial of the petition for rehearing en banc.
Bristol-Myers created a new chemical compound: entecavir. Its structure is a modification of a prior-art compound, apparently a common phenomenon in pharmaceutical chemistry, where small changes can make large differences. The prior-art compound (2'-CDG) was described in published papers. It had shown excellent activity against certain viruses, including the hepatitis B virus, in tests on cell lines in in vitro experiments; but it had never been tested even in animals, let alone humans, whether for efficacy or toxicity. Bristol-Myers’s novel compound proved to be effective and nontoxic (safe) for the treatment of hepatitis B, and it was patented and came to be approved and widely used for that purpose. In contrast, the prior-art compound never came to have any human-therapeutic use, because, just after Bristol-Myers sought its patent, 2'-CDG was tested in animals for the first time, and the tests so conclusively showed it to be toxic that it has never been used in humans. In short, the Bristol-Myers compound, which is a novel molecule, is dramatically different from the prior-art compound in providing practical human benefits: one provides such benefits, the other does not. But that difference was identified only after Bristol-Myers filed for its patent, because the prior-art compound, not having been tested in animals or humans, was not then known to be toxic.
After a trial, the district court invalidated the asserted claim of the Bristol-Myers patent under 35 U.S.C. § 103(a) (2006), holding that the new compound would have been obvious to a person of ordinary skill in the pertinent art at the time of the invention (here, the filing date of the patent application). In so holding, the court determined that such a hypothetical skilled artisan would have had a reasonable expectation of success in achieving therapeutic usefulness in humans and would not have found the favorable safety/efficacy profile of entecavir to be unexpected, because, at that time, the prior-art compound, never having been tested even in animals, was not known to be toxic. Bristol-Myers Squibb Co. v. Teva Pharm. USA Inc., 923 F.Supp.2d 602, 630-33 (D.Del.2013). On appeal, the panel in this case affirmed those determinations and the ultimate holding of obviousness. Bristol-Myers Squibb Co. v. Teva Pharm. USA Inc., 752 F.3d 967 (Fed.Cir.2014).
*1353 In considering whether en banc review is warranted, I focus on the doctrinal significance of the panel decision from two perspectives — looking at what the decision says, and at what it seems to decide on the facts. As to the first: It is a well-recognized principle, and one essential to our system of precedent, that statements in opinions must be read in context, considering their role in the decision and the facts of the case.[1] Nevertheless, advocates often ignore that principle, relying on phrases and sentences found through database word searches without reading the whole opinion, and arguing for a precedential effect that is unwarranted. I here point out why the panel opinion should not be taken to stand for certain propositions for which advocates are likely to cite it.
As to the second: Although it is not certain, the panel, in what it actually decided in affirming invalidity for obviousness on the recited facts, may have dismissed postfiling discoveries of prior-art compounds’ true properties as categorically irrelevant to the statutory inquiry. Or it may have more narrowly deemed insufficient the evidence here — that, the first time the prior-art compound was tested in animals, it proved so toxic that it had to be abandoned as a candidate for human-therapeutic use. Even if the panel merely rejected the particular post-filing evidence here as insufficient, it is significant (for how the decision will be invoked as precedent) that the panel did not give any case-specific reasons for doing so except timing: the discovery of the prior-art compound’s toxicity post-dated the invention. The panel decision seems highly likely to be viewed as addressing the timing-of-evidence question — whether generally or in this context. And that question is worthy of further attention.
Although I am not confident of the answers, I think that the ruling raises questions about core aspects of the widely used approach to obviousness analysis — particularly, the proper meaning of the related elements, “reasonable expectation of success” and “unexpected results.” Those questions would benefit from plenary consideration. In panel review, case-specific applications on complex facts necessarily consume almost all of the space of parties’ briefs, and attention is focused almost exclusively on this court’s own precedents. En banc review would allow a focus on and full analysis of the doctrinal issues, considering the language of section 103 (what it resolves and what it leaves open); the role of section 103 in the statute as a whole (which places a premium on early filing); Supreme Court precedents elaborating on the policy of section 103; our own precedents; congressional actions in light of those precedents; and pertinent, reliable *1354 information that may bear on assessing the real-world consequences of one answer or another in an industry where research is especially expensive and uncertain. The widened inquiry seems to me worthwhile.
A
1. The panel stated that this court’s en banc decision in In re Dillon, 919 F.2d 688 (Fed.Cir.1990), “explain[ed] that an unexpected result or property does not by itself support a finding of nonobviousness.” Bristol-Myers, 752 F.3d at 976 (citing Dillon, 919 F.2d at 693, 697). That statement must not be read out of context to declare that evidence of unexpected results cannot by. itself support an ultimate finding that a challenger has failed to demonstrate obviousness by clear and convincing evidence.
First: The panel made the statement only in discussing whether to uphold the determination about a key component of the traditional prima facie case in an obviousness challenge — that the hypothetical skilled artisan would have had not only a reason to create the new chemical compound (the claimed invention here) but also “a reasonable expectation of success” concerning its favorable human-therapeutic profile. Bristol-Myers, 752 F.3d at 976-77. The panel was not discussing whether, even if there were a sustainable finding of a reasonable expectation of that success, evidence of particular unexpected results—e.g., unexpectedly great efficacy or safety in the expected use, or efficacy and safety for an additional, unexpected use—could nevertheless support an ultimate finding of non-obviousness. Indeed, reading the statement to draw that conclusion would render immaterial the extensive discussion of unexpected results that comes next in the opinion. The panel did not introduce that discussion by suggesting that it was an “even if’ analysis unnee-'* essary to the bottom-line conclusion.
Second: Dillon itself does not establish that evidence of unexpected results cannot support rejection of an obviousness challenge despite supported findings of the elements of a prima facie case. The issue addressed and decided in Dillon was only what was needed to establish the prima facie case in the first place; and Dillon took care to stress that it was only that issue it was deciding, not the ultimate determination of obviousness. 919 F.2d at 697 (distinguishing In re Papesch, 50 CCPA 1084, 315 F.2d 381, 391 (1963), on ground that Papesch “did not deal with the requirements for establishing a prima fa-cie case,” stating: “Papesch is irrelevant to the question of the requirements for a prima facie case, which is the question we have here”). Dillon did not need to consider whether unexpected results could support rejection of a section 103 challenge despite a supported finding of the prima facie case elements, because Dillon concluded that the PTO properly found no unexpected results: “[Applicant] did not present any showing of data to the effect that her compositions had properties not possessed by the prior art compositions or that they possessed them to an unexpectedly greater degree.” 919 F.2d at 693.
Third: The panel in this case, like the court in Dillon, had no occasion to rule on the doctrinal relationship between a finding of unexpected results and a finding of the prima facie case elements. The panel upheld the district court’s determination that there were no appreciable unexpected results. Bristol-Myers, 752 F.3d at 977-78; see id. at 978 (“[T]he district court’s findings reflect that one of skill in the art would have expected entecavir’s hepatitis B’s efficacy, safety, and therapeutic window based on one’s knowledge of 2'-CDG.”); BristolMyers, 923 F.Supp.2d at 686 (“No witness testified that the [low toxicity] of the drug would have been ‘un *1355 expected. ”). On that premise, there were no unexpected results whose relationship to the prima facie case the panel had to consider.[2]
2. The panel decision also does not establish a precedent for the proposition that, putting aside the post-filing evidence, the proof of “reasonable expectation of success” — based entirely on in vitro experiments with the lead compound — was adequate. Bristol-Myers never argued otherwise to the court; it argued only that, once the post-filing evidence of 2'-CDG is considered, the proof of reasonable expectation of success was inadequate and the proof of unexpected results in any event compelling. Inadequacy apart from the post-filing evidence not having been argued, the panel opinion is not precedent for deeming the pre-filing evidence inadequate.[3]
This is worth noting because it seems to me a serious question whether, in this case and perhaps more generally, the purely in vitro experiments on the lead compound should be deemed to establish a “reasonable” expectation of success. The success that must be reasonably expected in this case would, I think, have to be success in what motivated the investment in the research — an acceptable safety/efficacy profile for human-therapeutic use.[4] Thus, whatever the precise meaning of “reasonable expectation” — a matter worth clarifying, as discussed infra — Teva had to show that a hypothetical skilled artisan would have had a reasonable expectation of acceptable safety of entecavir in humans in October 1990, when Bristol-Myers filed for its patent. And such an expectation, it appears undisputed, depended entirely on showing such an artisan’s reasonable expectation, at the time, that the lead compound, 2'-CDG, would be acceptably safe in humans.
There is a serious question whether any such expectation was reasonable, given that 2-CDG had been tested only in in vitro experiments — never even in animals, let alone humans. As a general matter, it may be that in vitro tests are not reliably predictive of human safety.[5] Although sta- *1356 tisties require careful examination to be used responsibly, I note that amici have pointed us to literature indicating' that only small percentages of compounds that start in the laboratory make it out the other end of the drug-development process.[6]
It may well be, of course, that in vitro testing supports a sound expectation about probable human safety for certain compounds even if it does not do so generally. But that is a matter to be addressed by scientific evidence about the particular compounds at issue in a given case. Here, with Bristol-Myers not having contested the point, the panel had no occasion to scrutinize the record to determine if there was evidence of a reliable basis for any prediction of human safety for 2'-CDG in October 1990. Optimism about the compound is not the same as a reasonably grounded prediction. And testimony that 2'-CDG had a “very good therapeutic window” in an in vitro test — which is all that the quote refers to, because 2'-CDG had never been given as “therapy” or even put into animals or humans — does not support safety in humans without sound evidence allowing the inference, none of which is apparent. Bristol-Myers, 752 F.3d at 971, 974, 978. The issue not having been contested, the panel decision cannot be taken to have resolved the issue.
B
As already noted, the panel opinion may be read by future litigants to suggest that any evaluation of prior art must focus exclusively on what was known about the prior art’s properties, and on that basis expected about entecavir, "at the time of the Bristol-Myers invention. See Bristol-Myers, 752 F.3d at 974, 977, 978. The panel opinion ultimately approves the district court’s decision to excise from its analysis any consideration of 2'-CDG’s later-discovered, severe toxicity. Id. at 978 (“The district court ultimately made the correct direct comparison of the patented compound to 2'-CDG, noting that prior art compounds, ‘including 2'-CDG,’ ‘showed effectiveness against hepatitis B without known toxicity issues.’ ”) (emphasis added) (quoting Bristol-Myers, 923 F.Supp.2d at 685). The timing-of-evidence reasoning seems at the heart of the obviousness invalidation. It raises questions that I think warrant further exploration.
1. Judge Newman identifies ways in which the panel’s approach to the timing-of-evidence question seems in tension with this court’s precedents. It appears that, at least since our predecessor court’s decision in In re Papesch, 50 CCPA 1084, 315 F.2d 381 (1963), the analysis of obviousness of new chemical inventions has involved “liberal consideration of post-invention evidence.” Rebecca S. Eisenberg, Pharma’s Nonobvious Problem, 12 Lewis & Clark L.Rev. 375, 395 (2008). The reason seems clear: “often it takes time to determine the properties of a new chemical through testing and observation that cannot take place until after the chemical is in hand,” id. at 396, and the statute has always provided an incentive to file early *1357 once the chemical is in hand (lest priority be lost), an incentive now enhanced by the 2011 adoption of a first-inventor-to-file system. Moreover, Judge Newman notes that the post-filing experiments comparing properties of the invention and prior-art compounds would seem often to have developed new information about both the invention and the prior-art compound. These precedents and past practices raise questions about the panel’s ruling.[7]
2. The statutory language does not itself provide an answer to the question of post-filing evidence.[8] It is true that the language directs courts (and the PTO) to ask a question about the time “before the effective filing date of the claimed invention” (the “time the invention was made” in the pre-2011 version). But the question is not what certain people in the field in fact thought at that time. Rather—to note three aspects of the language (others may be relevant too)—the question is whether (a) the claimed invention “as a whole” (b) “would have been” obvious to a (c) “person having ordinary skill in the art.”
As to the first of those elements, the Papesch doctrine has long treated all properties, including later discovered ones, as part of the invention “as a whole.” As to the third, the “person having ordinary skill in the art” is not a real-world person, but a hypothetical person, constructed in applying the provision to create a standard of patentability that effectuates the provision’s policy.[9] As to the second, the statute uses the verb phrase “would have been.” Grammatically, that formulation invokes a hypothetical situation dependent on some “if’ condition (would have been obvious if “x” had been true). In section 103, however, the required condition is not stated; there is no “if’ clause.
As a result, the statutory language itself requires courts to fill in the conditions for the hypothetical inquiry by an analysis of the provision’s history, role in the statute, and purpose, always considering workability of any approach. It is common to hypothesize knowledge of all pertinent prior art. See In re Moreton, 48 CCPA 928, 288 F.2d 940, 941 (1961); In re Citron, 45 CCPA 773, 251 F.2d 619, 620 (1958). It has been suggested, too, that the hypothetical inquiries should not take as a given the current amassing and organizing of re *1358 sources and talent into firms that undertake risky, expensive research, which might not exist without patent protection. See Michael Abramowicz & John F. Duffy, The Inducement Standard of Patentability, 120 Yale L.J. 1590, 1614-16 (2011). Whatever the proper approach, however, it is one that must be developed by looking at more than the effective-date-of-filing (previously, invention-date) phrase in section 103, whose terms as a whole call for a hypothetical inquiry requiring judicial definition.
8. The proper analysis of the post-filing evidence regarding 2'-CDG would seem to focus on two closely related phrases that identify standard parts of our obviousness analysis: “reasonable expectation of success” and “unexpected results.” Both phrases evidently bear several different potential meanings and so would benefit from clarification. And the identification of the proper meanings seems to have a strong bearing on whether the postfiling evidence here is material.
The phrase “reasonable expectation of success” on its face requires that any expectation of success be “reasonable.” The same reasonableness requirement would seem implicit, too, in the hypothetical character of the skilled artisan whose expectations count. The hypothetical character of the person doing any expecting seemingly also should mean that “unexpected results” contains a reasonableness requirement. What must be “reasonable” are (hypothetical) “expectations.” But “expectation” is a term that covers different ground in different circumstances.
Clarifying these concepts seems important here. Should a reasonable expectation mean a mere educated guess or surmise or plausible possibility? Should it mean an affirmative well-grounded prediction, using a 50% or other probability, based on the standards that scientists would use professionally to assert such predictions — whether in a scientific journal or in making a decision about how to allocate scarce research funding? Depending on the meaning of “expectation,” should the reasonableness of the expectation consider not just what evidence has been developed but also what evidence could easily be developed but has not yet been — so that, for example, it may be irresponsible to assert an expectation in the absence of such available but not-yet-secured evidence?
We have tied the “reasonable expectation of success” standard to the Supreme Court’s use of “predictable” in KSR, 550 U.S. at 416, 417, 421, 127 S.Ct. 1727. See PharmaStem Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342, 1360, (Fed.Cir. 2007). That precedent suggests a higher rather than lower standard for “reasonable expectation.”
Perhaps the statutory policy of section 103 does as well. The Supreme Court has suggested the policy (not for case-by-case application but to inform doctrinal standards): to deny patent protection for a new invention only when the invention would have been forthcoming (at about the same time) even without patent protection, i.e., when patent protection was not needed to induce its emergence.[10] Moreover, like the word “obvious” in one understanding, what protection may be needed to induce the invention plausibly depends on the costs and uncertainties of the work *1359 required for success. See, e.g., Abramowicz & Duffy, supra, at 1613-14, 1655; William M. Landes & Richard A. Posner, The Economic Structure of Intellectual Property Law 304 (2003).
4. The definitional questions seem to bear materially on one issue central to Bristol-Myers’ argument-whether the post-filing evidence of 2'-CDG’s immediate and conclusive failure in animal testing is significant to assessing whether, before such testing, there truly was a reasonable expectation of relevant (human-therapeutic) success of 2'-CDG (and hence of ente-cará1). As a general evidentiary matter, it seems relevant to determining the reasonableness of any expectation before conducting a readily available animal test that the very first animal test immediately showed such toxicity that 2'-CDG has never since been tried in humans.[11] Even in the arena of business forecasts — where changes in the world over time can dramatically affect results — courts temper a great caution about hindsight bias with a recognition that “a gross disparity between prediction and fact” may be relevant to assessing the reasonableness of the prediction.[12] All the more so in the present context, which involves a general biological property (toxicity of a particular compound) that should be the same today as it will be next year. But whether this is a sensible analysis may well depend on precisely what “reasonable expectation” means in the present context.
I would grant rehearing en banc to enable a full exploration of these questions.

. See, e.g., R.A.V. v. City of St. Paul, 505 U.S. 377, 386-87 n. 5, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); Armour & Co. v. Wantock, 323 U.S. 126, 132-33, 65 S.Ct. 165, 89 L.Ed. 118 (1944); Sterling v. Constantin, 287 U.S. 378, 400, 53 S.Ct. 190, 77 L.Ed. 375 (1932); Nat’l Am. Ins. Co. v. United States, 498 F.3d 1301, 1306 (Fed.Cir.2007); Perez v. Dep’t of Justice, 480 F.3d 1309, 1312 (Fed.Cir.2007); N. States Power Co. v. United States, 224 F.3d 1361, 1367 (Fed.Cir.2000); Fromson v. W. Litho Plate & Supply Co., 853 F.2d 1568, 1578 (Fed. Cir. 1988) ("Cases should not be cited for mere words. What counts is what the court did in a cited case.”), overruled on other grounds by Knorr-Bremse Systems Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337 (Fed.Cir.2004); In re Hounsfield, 699 F.2d 1320, 1323 (Fed.Cir.1983) ("Although some of the foregoing judicial statements standing alone could be read to support the principle the Board here applied, those statements must be read in the light of the facts of the cases, the precise issues to be resolved therein, and the courts' holdings.”); In re Van Ornum, 686 F.2d 937, 946 (CCPA 1982) (“Precedents are of value for what they decide, not for every sentence they contain.”); In re Ruscetta, 45 CCPA 968, 255 F.2d 687, 689 (1958).

. The panel likewise had no occasion to address broader issues concerning the familiar use of a “prima facie case” as a sequence-of-presentation, issue-organizing tool in a challenge to an issued patent, for which invalidity requires clear and convincing proof, Microsoft Corp. v. i4i Ltd. P’ship,-U.S.-, 131 S.Ct. 2238, 2252, 180 L.Ed.2d 131 (2011). Cf. U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-16, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (discussing burden of persuasion and presentation-of-proof scheme in discrimination cases); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (same).

. See, e.g., District of Columbia v. Heller, 554 U.S. 570, 625 n. 25, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008); United States v. Verdugo-Urquidez, 494 U.S. 259, 272, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990); United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 38, 73 S.Ct. 67, 97 L.Ed. 54 (1952); JVC Co. of Am. v. United States, 234 F.3d 1348, 1353-54 (Fed. Cir.2000) (citing earlier cases).

. See Leo Pharm. Prods., Ltd. v. Rea, 726 F.3d 1346, 1357 (Fed.Cir.2013); In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d 1063, 1070 (Fed.Cir. 2012); Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1364 (Fed.Cir.2007); Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc., 231 F.3d 1339, 1345 (Fed.Cir.2000).

. See Fed. Judicial Ctr., Reference Manual on Scientific Evidence 645 (3d ed. 2011) ("Relatively few [in vitro toxicity tests] have been validated by replication in many different laboratories or by comparison with outcomes in animal studies to determine if they are predictive of whole animal or human toxicity.”); In re Gangadharam, 1989 WL 127023, at *2 (Fed.Cir. Oct. 27, 1989) (noting that a prior art’s "remarking that the positive in vitro results 'favored' use in vivo does not meet the statutory standard” of obviousness); see also *1356 Anna Astashkina et al., A Critical Evaluation of In Vitro Cell Culture Models for High-Throughput Drug Screening and Toxicity, 134 Pharmacology & Therapeutics 82, 82, 94 (2012) (noting “strong evidence that in vitro cell-based assays and [even] subsequent preclinical in vivo studies do not yet provide sufficient pharmacological and toxicity data or reliable predictive capacity for understanding drug candidate performance in vivo”).

. See, e.g., Henry Grabowski, Patents, Innovation, and Access to New Pharmaceuticals, 5 J. Int'l Econ. L. 849, 849-51 (2002) ("[F]ewer than 1% of the compounds examined in the pre-clinical period make it into human testing.”); Michael Hay et al., Clinical Development Success Rates for Investigational Drugs, Nature Biotechnology Jan. 2014, at 41-42, 47 (10-15% of drugs entering human testing emerge as marketed drugs).

. In still other ways, obviousness analysis routinely considers relevant facts not in existence at the time of patent filing, e.g., commercial success and proven meeting of a long-felt need. See KSR International Co. v. Teleflex Inc., 550 U.S. 398, 406, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007); Galderma Labs., L.P. v. Tolmar, Inc., 737 F.3d 731, 740 (Fed.Cir. 2013); Perfect Web Techs., Inc. v. InfoUSA, Inc., 587 F.3d 1324, 1332-33 (Fed.Cir.2009).

. Section 103, reflecting the first-inventor-to-file system adopted in 2011, now reads; "A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made.” 35 U.S.C. § 103.
35 U.S.C. § 103(a) (2006) was similar but reflected the pre-2011 first-to-invent system; "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

.E.g., Bristol-Myers, 752 F.3d at 978; Norgren, Inc. v. Int’l Trade Comm’n, 699 F.3d 1317, 1327 (Fed.Cir.2012); Kimberly-Clark Corp. v. Johnson & Johnson, 745 F.2d 1437, 1454 (Fed.Cir.1984).

. See Graham v. John Deere Co., 383 U.S. 1, 11, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) (“The inherent problem was to develop some means of weeding out those inventions which would not be disclosed or devised but for the inducement of a patent.”); KSR, 550 U.S. at 419, 127 S.Ct. 1727 ("Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress. ..see generally Abramowicz & Duffy, supra. Statutorily, this approach amounts to adding something like "if patent protection *1359 had been unavailable” as the missing "if” clause for the "would have been” phrase.

. Cf. e.g., 22 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure § 5171, at 752-57 (2012) (experiments conducted after the event in question may be admitted to show what could have been done, what might have happened, to reveal the characteristics of a product or the dangers arising from it); Burke v. Deere & Co., 6 F.3d 497, 505-06 (8th Cir.1993) (accidents taking place after a manufacturer sold a specific item to the plaintiff admissible to determine the actual risk of harm posed by the defective product); Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron, 805 F.2d 907, 918 (10th Cir. 1986) (results of a post-accident stress test admissible in products liability trial, provided study redacted any evidence of a subsequent redesign); Bailey v. Kawasaki-Kisen, K.K., 455 F.2d 392, 397-98 (5th Cir.1972) (where individual was injured by a falling boom, evidence of the boom falling a second time was admissible to prove that the boom was in fact defective), abrogated in distinct respect (subsequent remedial measures) by Fed.R.Evid. 407, as stated in Rutledge v. Harley-Davidson Motor Co., 364 Fed.Appx. 103, 106 (5th Cir.2010).

. Spitzberg v. Houston Am. Energy Corp., 758 F.3d 676, 691 (5th Cir.2014) (a “gross disparity between prediction and fact” may form the basis for 10b-5 liability) (quoting Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 248 n. 13 (5th Cir.2009)); Marx v. Computer Scis. Corp., 507 F.2d 485, 489 (9th Cir.1974); G & M, Inc. v. Newbem, 488 F.2d 742, 745-46 (9th Cir. 1973).